UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 18-CR-20668-DMM

UNITED STATES OF AMERICA

               Plaintiff,

vs.

SUNIL CHOPRA,

               Defendant.

_____/

## <u>SENTENCING MEMORANDUM ON BEHALF OF SUNIL CHOPRA</u>

The Defendant, Sunil Chopra, respectfully submits this memorandum to provide information to assist the Court in fashioning a sentence "sufficient but not greater than necessary" to achieve the statutory purposes of punishment as required by 18 U.S.C. § 3553(a). Mr. Chopra seeks variances as set forth below.

The Supreme Court in such cases as *United States v. Booker*, 543 U.S. 220 (2005), *Rita v. United States*, 551 U.S. 338 (2007) and *Gall v. United States*, 552 U.S. 38 (2007) restored the district court's power to fashion a sentence tailored to the individual circumstances of the case and the defendant by permitting the courts to consider factors other than the sentencing range presumed by the United States Sentencing Guidelines. Under Section 3553(a), courts are required to sentence below the calculated guideline range if such a sentence would be sufficient to achieve the purposes set out in the statute: justice, deterrence, incapacitation, and rehabilitation.

Here, Mr. Chopra respectfully requests that the Court consider several important circumstances of this case in determining the sentence. First, he has continuously expressed his remorse, accepted responsibility for his conduct, and entered a plea of guilty. His self-examination of his conduct has extended to giving several presentations to college business students where he has explained his current legal situation, and the poor choices that brought it about, in the hopes that he can help others avoid his mistakes. Second, Mr. Sunil Chopra, except for this one offense, is a man of integrity and good character.  He has an unblemished personal history as has been attested to by the numerous people who have written to the Court. Third, it is clear that his criminal behavior in this case is truly aberrant. He has never before committed any offense and he poses no risk of recidivism. Fourth, Mr. Chopra's possible loss of his freight forwarding and transportation services company, which he successfully grew over the past decade, and his personal reputation as a result of his criminal conduct, should be considered in determining a minimally sufficient sentence.

## PROCEDURAL BACKGROUND

On August 19, 2019, Mr. Chopra pled guilty to Count Five of a seven-count superseding indictment which charged him with conspiracy to obtain by fraud and deception pre-retail medical products in violation of 18 U.S.C. § 670(a)(6).  When he became aware of the warrant for his arrest, he immediately made arrangements to fly from Chicago (his residence at the time) and voluntarily surrendered. Since he was released on bond almost 16 months ago, he has traveled back to Miami from his current home in California when required by this Court and has remained in full compliance with the conditions of his bond.

Sentencing is set for December 16th at 10:00 a.m. The United States Probation Department issued it's Presentence Investigation Report ("PSR") on October 24th and Mr. Chopra sent his objections to the probation officer on November 18th. *See Composite Exhibit A.* Subsequently, Mr. Chopra and the government reached an agreement, whereby he agreed to withdraw certain objections related to his offense conduct and the government agreed to stipulate to others he had raised. Specifically, Mr. Chopra agreed to withdraw his objection to a two-level enhancement for the number of victims. He also agreed to withdraw his objection to the Report's loss amount calculation (+24) in exchange for the government agreeing to recommend a lower loss enhancement (+22). This roughly took into account the fact that Mr. Chopra's company did not begin doing business with Uniworld until February of 2011. Significantly, Mr. Chopra agreed to withdraw his loss objection *subject to the express condition that should the Court find Javat and Soto's loss arguments compelling—and thereby reduces the loss figure lower than $25-65 million— that figure would also apply to him.* His withdrawal of his joint objection to the number of victims enhancement was also conditional as it relates to the Court's finding for Javat and Soto.

Although Mr. Chopra's other objections relating to his financial status and personal information remain unresolved at this time and he has substantial arguments meriting a significant downward variance, he agrees that an advisory guideline range based upon the parties agreement results in an imprisonment range of 97 - 121 months. Should the Court, however, find a lower loss amount for the conspiracy, the advisory guidelines calculation may indeed be materially lower. Regardless, Mr. Chopra's position, as set forth below, is that the 18 U.S.C. § 3553(a) sentencing factors justify a significant downward variance.

## POST-*BOOKER* SENTENCING CONSIDERATIONS

As noted above, Section 3553(a)(2) provides the framework for setting a just sentence.

It states that the purpose of a sentence should be:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In determining the minimally sufficient sentence, § 3553(a) further directs the sentencing courts to consider the following factors:

1)     the nature and circumstances of the offense and the history and characteristics of the defendant (§ 3553(a)(1));

2)     the kinds of sentences available (§ 3553(a)(3));

3)     the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct (§ 3553(a)(6)); and

4)     the need to provide restitution to any victims of the offense (§ 3553(a)(7));.

## ANALYSIS OF THE STATUTORY SENTENCING
## FACTORS AS APPLIED TO THE FACTS OF THIS CASE

A.    **The Nature and Circumstances of the Offense and the History and
      Characteristics of the Offender**

1.    History, nature, and circumstances of the offense

In 2011, Uniworld hired ITL, Mr. Chopra's company, as a freight-forwarder to ship the purchased goods from the victim companies. The Uniworld account was but one of ITL's accounts:   during the time period of the conspiracy (2014-2017)  only represented 219 out of 9,823 jobs (2.2%). From 2011-2017 the Uniworld account represented 363 out of 21,601 jobs (1.6%). During both aforementioned time periods, Uniworld never represented more than 2.8% of ITL's gross revenues. *See Composite Exhibit B.*

In roughly 70% of the shipments ITL performed for Uniworld, Uniworld  requested ITL to perform "blind" shipments—a practice in the shipping industry where the seller is not informed of the ultimate destination of the goods. Uniworld would represent to the manufacturers that ITL would act as their freight-forwarder in the transaction, thereby facilitating the export of the goods, but instruct ITL to only perform a domestic shipment—usually to James Sipprell's warehouse in Calhoun, GA.  In these blind shipping scenarios, the companies uniformly relied upon Uniworld's misrepresentations that ITL was the freight forwarder and prepared paperwork meant to delegate their filing responsibilities to ITL—despite the fact that ITL was acting in the capacity of a domestic truck broker, not a freight forwarder. While ITL and its employees never did anything to disabuse the manufacturers of this deception, in the vast majority of shipments they did not undertake any affirmative deceptive acts themselves. It is important to note that when ITL had their truckers

pick up the goods,  the truckers would give the manufacturers a domestic bill of lading almost always listing ITL's office address in Irvine, California as the destination of the goods. If Messrs. Chopra and Armando had limited their conduct only to following Uniworld's shipping instructions, and not actively assisted in misleading the manufacturers *after* the shipments were completed, there may not have been anything illegal about ITL's conduct. That being said, Mr. Chopra recognizes that he crossed the line in several respects and that the far better course of action would have been to tell Uniworld to find another logistics company.

The PSR, however, does leaves a false impression when it states that Mr. Chopra "knowingly furthered the fraud scheme by … creating fake documents that could be supplied to the manufacturers as 'proof' that the goods had been exported for sale overseas as promised" (p. 12; par. 33), and that he "provided the manufacturers false or misleading documents stating that the products were shipped overseas, when in fact the products never left the United States at all and went instead to Sipprell's warehouse in Georgia" (pp. 10-11; par. 28). Out of all of the shipments ITL completed for Uniworld from 2011 to 2017, ITL/Chopra/Armando sent a fake or false document twice, both times to the same manufacturer, Sklar. One of these occasions was when ITL sent an unofficial, unsigned airway bill to manufacturer Sklar. *See Composite Exhibit C*. That being said, they further assisted Uniworld/Javat in misleading the manufacturers about the true destination of the goods by continuing to perform these blind shipments with full knowledge that Uniworld/Javat was falsely claiming that the goods were to be exported.

ITL/Chopra/Armando also facilitated the conspiracy by knowingly assisting in the export of dummy shipments so that Uniworld could provide export documents to the

manufacturers purportedly showing that previously diverted goods had been exported. In and handful of transactions, ITL also would ship the products abroad and route them directly back to the United States for import,  knowing that Uniworld told the manufacturers that the products were for export.   Significantly, however, close to 30% of the shipments ITL performed for Uniworld were non-blind shipments, the majority of which resulted in the manufacturers receiving a bill of lading that matched Uniworld's bills of lading and reflected Mr. Sipprell's warehouse in Georgia as the destination address. *See Composite Exhibit B.*

Mr. Chopra admits that he conspired by fraud and deception to obtain pre-retail medical products.  But it wasn't until he found out there was a warrant outstanding for his arrest that he fully appreciated the gravity of his actions. His  eagerness to continue the growth of his company which he started in 2009 (and not lose a client) skewed his judgement as well as his moral compass.   But despite the astounding loss calculation in this case, Mr. Chopra's company barely profited from ITL'S relationship with Uniworld. ITL's total revenue earned from Uniworld shipping jobs performed over the time of the conspiracy was $740,113.78, which represented 2.7% of total revenues for the company. *Composite Exhibit D, pages 157-160.* Given the fact that the average margin in the shipping industry is approximately 21%[1] ITL's net income from Uniworld's business during this time was roughly $166,525.60 (using a 22.5% margin). Moreover, ITL's current accounts receivable report for Uniworld reflects 27 unpaid Uniworld invoices totalling almost $180,000. *See Composite Exhibit E.*  Consequently, at the time ITL and Uniworld ceased business with each other, ITL had a loss of $13,134.71 for the time period of the conspiracy (Net income of $166,525.60 minus Uniworld accounts

---

[1] *See Margins by Sector (US)*, NYU Stern School of Business,
http://pages.stern.nyu.edu/~adamodar/New_Home_Page/datafile/margin.html.

receivable $179,660.31 equals   -$13,134.71). Expanding the time period from the time ITL began doing business with Uniworld, in February of 2011—not 2008—ITL's net income from February 2011 through 2017 comes out to approximately $68,943.72 (Net income from February 2011 to 2017 of $82,078.43, plus the net income for the time period of the conspiracy of -$13,134.71 equals $68,943.72 .

As discussed in depth later, Mr. Chopra strives to be a good husband, parent, son, brother, and citizen. When this offense occurred in 2014-2017, he should have known better than to engage in these deceptive practices. He engaged in criminal conduct about which he is extremely remorseful. But unlike the other conspirators, save Mr. Armando, his primary motive was to *earn* ITL money by providing shipping services and charging customary shipping fees. A sentence that is sufficient, but not greater than necessary, to serve the directives of 18 U.S.C. § 3553(a) should take this into account.

## 2.   History and characteristics of Mr. Chopra

Mr. Chopra's background, and the letters submitted by family and friends, demonstrate his good character and illustrate the fact that this offense is an isolated incident in an otherwise wholly admirable life.

### *Family*

The concept of family is the central tenet of Mr. Chopra's life. He is 53 years old and recently married his fiance, Mi Jeong Lim, whose love, support and regard for him are undiminished by these events and charges—despite the toll the prolonged pendency of this case has had on their relationship. Mr. Chopra has three children from previous marriages:

Jillian Chopra, age 23; Sophia Chopra, age 16; and Ashwin Chopra, age 14. His two youngest, Sophia and Ashwin, live with their mother in Brisbane, Australia, however, he maintains a close relationship with both of them. They are old enough to process the fact that their father may go to prison, but he has yet to share his situation with them.  But he has discussed his situation at length with his older daughter, Jillian. In her letter of support, she describes the vital role that he played in her life growing up, despite her parents' divorce and the geographic separation:

> My parents divorced when I was five years old. My dad never spoke a single negative word about my mother. He handled the situation as well as I can possibly imagine. While I was growing up, my father lived in many different cities and countries. Despite the long distances, he made sure he remained a constant presence in my life. He attended my piano recitals, student talent shows, water polo matches, and swim meets. He took me to places like Vancouver where we took a week-long road trip. He flew me to Australia to meet my half-siblings Sophia and Ashwin.
>
> Without fail, my father supported me emotionally and financially. He was available to talk and made sure I was taken care of, even when he was travelling.

*Composite Exhibit F, page 3.*

His lifelong friend of forty years and godfather to Jillian, Atul Dhablania, echoes how seriously Mr. Chopra takes his role as a parent and the role he plays in his children's lives:

> The divorce of Sunil and Jillian's mother was painful for everyone.  Even during the low moments, Sunil always put the wellbeing of his daughter first.  Sunil continues to make sure that Jillian has everything she needs.  He cherishes all of his children and works hard to provide a secure life for them.

*Composite Exhibit F, page 5.*

Mr. Chopra has not only played a vital role in his children's lives but also plays an important role in his extended family's lives. As his nephew, Andy Anand, explains:

While I was growing up in India, my uncle stayed in constant contact with me from his various posts overseas. No holiday went by without a card, a letter, photos, or small gifts from Uncle Sunil.

…

My uncle was always there to help any family member in need. In his early career, Uncle Sunil sent a large amount of his income back to my grandparents. If there was a cousin who needed financial support, my uncle helped with no expectation of being repaid. Also, I know that he contributed to the costs of family weddings. To this day, he makes sure that my elderly grandmother is cared for with tenderness and dignity.

*Composite Exhibit F, page 7.*

One of the most difficult things Mr. Chopra has had trouble coping with is the incongruence between his actions in this case and his dedication to living as an example for his children.  His self examination has compelled him to  use his experience as a teaching tool for Jillian in the hopes she can learn from his mistakes and make better decisions in her own life.

In Jillian's own words:

From the beginning of this case, my dad has been honest and clear about exactly what he did wrong. He did not hide the truth from me and made no excuses for his conduct.

…

I wish my dad had made better decisions and had stopped to think more about what he was doing. While explaining it to me, he emphasized how important it is to take a step back from what you are doing - no matter how busy or pressured you are - to question your actions when that little voice inside you is trying to get your attention.

*Composite Exhibit F, pages 3-4.*  His desire that others learn from his experience extends to his nephew, Andy, elaborates:

Knowing that I might run my own business someday, Uncle Sunil told me everything about this legal case.  He explained to me what he did wrong and, in hindsight, the different choices he would make today.

*Composite Exhibit F, page 8.*   Mr. Chopra's concern about his children's ability to reconcile his actions in this case with his efforts to model an ethical law-abiding ethos is rooted in the abiding shame he has felt since the beginning of the case.

### Remorse and Acceptance of Responsibility

Mr. Chopra's shame, remorse, and deep seated desire to make amends for his actions, has motivated him to attempt to impact others beyond his family circle. On his own initiative, he has given several guest lectures to college business students about the consequential decisions they will face when they enter into the business world in the hopes that they will learn from his experience. In his letter to Mr. Chopra thanking him for giving a presentation to his class, USC Professor Gregory Kling highlighted the impact the presentation had on his students:

> They saw you – someone about to be sentenced – as a real person, trying to get through life, but one who had serious lapses in judgment. It is easy for students to miss the severity of what happens when someone has a severe ethical lapse if they only hear about it from the professor. You put a real face on the issue and touched many of the students on a very deep level.

> The fact that you accepted responsibility completely and spoke openly about the consequences of your actions helped the students to see how unethical situations can happen and how they should be avoided.

*Composite Exhibit F, page 9.*   Mr. Chopra's presentation had an equally profound impact on another business school class at Whitworth University.

Whitworth Professor Tara Lambert created an assignment for her class based partly on Mr. Chopra's presentation.  She later shared some of her student's responses with Mr. Chopra:

> "The lesson I learned from Mr. Chopra is that 'if you see something you need to speak up.'  Whether it is by asking questions, finding a mentor, or quitting, your life will be better in the long run if you act in the moment, no matter how uncomfortable you are ... in my future career I will always remember to continue

developing my core values, as well as act in an ethical manner when faced with a tough situation."

…

"Throughout his talk, Sunil continually mentions how the ethical dilemma in his company  was not dealt with due to how busy they were all the time and the perceived unimportance of the issue … However, his story showed that these are issues that can have major consequences for individuals and entities outside the business  and  so  officers  like  Sunil  should  be  especially  aware  of  their responsibilities both internally and externally."

*Composite Exhibit F, pages 10-13.*

Mr. Chopra's contrition, desire to accept responsibility, and to make amends for his actions,  is not limited to cautioning others to not repeat his mistakes.  It is also reflected in his decision, at great personal cost given his present financial situation, to make a restitution payment  of $30,000. He is also currently selling his car and looking at other ways he can make significant restitution payments prior to surrendering to serve his sentence should the Court sentence him to a term of imprisonment.

### *Community Service*

A running theme in his letters of support is Mr. Chopra's service to others.  Mr. Dhablania, his lifelong friend, states that he "inherited his family's deep sense of service and devotion" and sees "those qualities in every aspect of Sunil's personal and professional life … Throughout this legal process, Sunil has kept his focus on the wellbeing of others.  Since childhood, he has always put other people first." *Composite Exhibit F, pages 5-6.*  Echoing Mr. Dhablania, his nephew, Mr.Anand, elaborates:

Whether it is personal or business, my uncle seems to be available for anyone and anytime. It does not matter if it is an old friend, a struggling cousin, or a big new client. My uncle feels a sense of duty to his fellow human beings. If there is a way to be of service, my uncle will do it.

*Composite Exhibit F, page 7.*   Consistent with this ethos is Mr. Chopra's long standing support of charitable organizations in his native India.

Mr. Chopra has been a long time benefactor of an informal dog shelter in India that attempts in small part to mitigate the suffering of the millions of stray dogs that roam the streets.  His donations have enabled the organization to increase the number of animals that it can shelter, feed, and provide sorely needed medical care.  *Composite Exhibit F, page 14-15.* Mr. Chopra's sense of service is not limited to sharing his cautionary tale with students and donating money.  Since 2014, he has volunteered a significant amount of his time, as well as money, to a training center for the visually handicapped. Mr. Pawan Sharma, secretary of the organization, describes the volunteer work he has performed for the center:

> He gives several hours of audio recording for books being used by the undergraduate students.  It is of great help to the students and the centre.  These audio books serve as important assets in the digital library for the students to refer to and learn from … he also volunteers in various activities like sale of candles made by visually impaired students, recently financial help for Para Judo Athletes by sponsoring Judo dress and shoes.

*Composite Exhibit F, pages 16-17.*

Ironically, Mr. Chopra's sense of duty has also extended to exposing fraud during the same time span that it did business with Uniworld. In 2013, Mr. Chopra and Bill Armando became suspicious about several shipments due to the nature of the buyer's correspondence, the way the shipments were being handled, and the buyer's payment method.. Under directions from Mr. Chopra, Bill Armando investigated the matter and found that the purchase orders were fraudulently obtained from the University of California system. ITL stopped all shipments and contacted the authorities. ITL also reached out to the victim suppliers and made

arrangements to return the shipments. Later, the case agent from Homeland Security communicated his appreciation in an email to Mr. Armando. *Composite Exhibit G.* In an unrelated case in 2014, ITL stopped multiple shipments being planned for export to Indonesia when it discovered a client using a false name, buying merchandise, and shipping to its warehouse for consolidation. Close inspection of the shipping labels revealed that false identities and stolen credit card information were being used. ITL immediately began notifying all of the suppliers, reported the fraud to the authorities, and returned all of the cargo to the suppliers.

The very reason this case has had such a devastating effect on Mr. Chopra and his family is that it is so dissonant from the life he has led. Those closest to him truly believe that his violation of the law is an aberration of character. Perhaps the person best positioned to opine on Mr. Chopra's character is Mr. Dhabliania, his lifelong friend and an investor in ITL, who states in his letter :

> Even knowing about his legal problems, I would invest in any future project of Sunil's.  Speaking from many years as a business leader, I am proud to say that my dear friend is one of the most talented, decent, and ethical men I know.

*Composite Exhibit F, page 5.*  Robert Bell, his friend and colleague of 30 years, in a similar fashion, explains that over the course of their relationship:

> I have always found Sunil to be intelligent, personable, and honest. I was surprised when he called to inform me that he'd gotten into legal trouble. As usual, he was straight-forward and candid about the seriousness of his case.
> …
> I wish Sunil had avoided the mistakes that brought him into the criminal justice system ...Knowing this, I would still work with [him] again.  I would not hesitate to recommend clients to his company. I have faith in him as a human being and as a trustworthy shipper.

*Composite Exhibit F, pages 18-19.*   Abraham Amouyal, CEO of a company that ITL has worked with over the past 5 years opines:

> When I first heard about Sunil's legal trouble, I was very surprised.  His mistakes in the case are completely out of character for him and his company  … I have worked in international trade for many years.  Sunil is one of the finest, most helpful, and decent men I've ever worked with. … Despite his legal trouble, I will continue to work with him in the future without hesitation … He is a fine man and I am proud to stand with him today.

*Composite Exhibit F, page 20.*

### 3.      The kinds of sentences available

Pursuant to 18 U.S.C. §§ 3551, 3561, and 3571, the available sentences for Mr. Chopra, based upon his conviction for a violation of 18 U.S.C. § 670(a)(6) include probation, a term of imprisonment, and a fine. The Court is entitled to consider probation as an option in all cases except when it is statutorily prohibited, a prohibition which is not applicable here. "Moreover, the Guidelines are only one of the factors to consider when imposing sentence, and § 3553(a) directs the judge to consider sentences other than imprisonment," even when probation would not be permitted under the Guidelines. *Gall*, 552 U.S. 38, 59 and n.11 (2007). Although Probation stated in the PSR that he is able to pay a fine, the underlying financial data (both personally and for his businesses) cited in the report is inaccurate. Mr. Chopra filed numerous objections to the financial section of the PSR correcting the inaccurate information as to, among other things,  the value of his companies. To date, Mr. Chopra has not received any response from probation or an addendum to the PSR.

4.      The need to avoid unwarranted disparities

Section 3553 provides that the sentencing court shall consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).  In the proper case, the sentencing court may look to codefendant disparity when fashioning a reasonable sentence. *United States v. Martin*, 520 F.3d 87 (1st Cir. 2008) ("district courts have discretion, in appropriate cases, to align co-defendants' sentences somewhat in order to reflect comparable degrees of culpability—at least in those cases where disparities are conspicuous and threaten to undermine confidence in the criminal justice system"). *See also U.S. v. Neufeld*, 223 Fed.Appx. 887 (11th Cir. 2007) (affirming sentence of 48 months where the Guidelines range had been 135 to 168 months based in part on disparity between the guideline sentence and the sentences imposed on Neufeld's codefendants).

Mr. Chopra and Bill Armando' role in the conspiracy, as well as the paltry gain ITL received during the course of its relationship with Uniworld, stands in stark contrast to the other defendants facing sentencing.  Unlike the other defendants, ITL was a service provider which only received customary fees for its services.  The evidence in the case clearly shows that Uniworld hired ITL as a freight-forwarder to ship goods it was purchasing from the victim companies. Far from exercising any degree of control or authority in the conspiracy, ITL performed work for Uniworld according to its strict specifications—which is precisely why Mr. Chopra and Mr. Armando became complicit in the conspiracy.  Had they not been so zealous to please Uniworld as their customer, and refused to assist them in misleading the victim companies, they would not be involved in this case.

The nature of ITL's role as a service provider illustrated by the fact that on multiple occasions in the course of providing shipping services to Uniworld, Mr. Chopra's company refused to release Uniworld shipments due to Uniworld's non-payment. The government's discovery includes emails between Javat and Mr. Chopra where Javat is expressing anger at Mr. Chopra for putting holds on shipments for non-payment. *See, e.g. Composite Exhibit H.* There are also a multitude of emails discussing the competitiveness—or lack thereof— of ITL's rates. Javat would often threaten to take his business elsewhere unless ITL would offer more competitive rates. *Exhibit I.* The government's evidence demonstrates unequivocally that ITL, and by extension Mr. Chopra and Mr. Armando, were subservient to almost all other members in the conspiracy.

The conduct and financial gain of Mr. Chopra and Mr. Armando were markedly different from that of Javat, Sipprell, Soto, and Daskos. While it is not necessary to spend time distinguishing ITL's role from Uniworld/Javat and James Sipprell, who are clearly more culpable and gained far more than Mr. Chopra, it is worth highlighting Mssrs. Chopra and Armando's roles from Soto, and Daskos.  The government has conceded that Chopra and Armando stand in a markedly different position from Soto. The government's evidence demonstrates that unlike ITL, Soto's company routinely charged double the customary fees for his services.  Although Mr. Chopra is not aware of the exact amount Mr. Soto earned from the conspiracy, the government has represented to the Court that Soto made at least as much money from the conspiracy as any other participant aside from Javat or Sipprell.

It is *extremely* important, however, to examine the government's characterization of George Daskos' role, gain, and loss calculation. Dasko's factual proffer, as well as the PSR, attempts to limit his apparent role and financial involvement in the conspiracy, only attributing to him a loss calculation of approximately $500,000. This, despite the fact that a simple review of spreadsheets of James Sipprell's companies' bank accounts that the government provided in discovery show that *Daskos paid Sipprell's companies nearly $11 million, purportedly for the purchase of goods, and also received at least $365,000 for providing services to the conspiracy. See Composite Exhibit J.* In contrast to the government's representations to this Court, Daskos appears to have played a far greater role in the conspiracy as a ready purchaser of a significant percentage of the fraudulently obtained goods, and, therefore, should be held responsible for a far greater loss amount than $500,000. Despite this uncontested evidence, the government also asserts that Daskos is deserving of a minimal role reduction. If this assertion is correct, then it is incongruent for this Court to sentence Chopra and Armando without recognizing their lesser culpability.

As stated previously, ITL never had a proprietary interest in any of the goods, made very little money on the account relative to the loss calculation, and did not exercise any decision making authority. It was hired to ship goods and did so in conformity with it's customer's specifications. It is also important to recognize that the previously cited ITL financial figures relate to Mr. Chopra's *company's* net income from the shipments, not his or Mr. Armando's *compensation* from ITL, which would have been negligible considering the modest salaries both drew and the fact that Uniworld's business only represented approximately 2.7% of the company's gross revenues during the relevant time periods. *See*

*Composite Exhibit K*.  Taking into account the fact that Mr. Chopra barely profited from the conspiracy, it is not actually even fair to characterize him as being similarly situated to the other defendants. *See United States v. Parker*, 462 F.3d 273, 278 ("§ 3553(a)(6) by its terms plainly applies only where codefendants are similarly situated"). To the contrary, he is *dissimilarly* situated and, thereby, deserves a more *lenient* sentence.

We, therefore, ask the Court to consider the sentences of these other defendants when fashioning Mr. Chopra's sentence. A variance in this situation is consistent with the principle that co-defendants who are convicted of the same crime should receive similar sentences.  If this Court sentences Daskos, finding he had a limited role and was only responsible for a loss of $500,000, the law, fairness, and equity,  it would not be hyperbolic to suggest that it would be an injustice for Mr. Chopra and Mr. Armando to receive harsher sentences.  In fact, the evidence in this case merits the opposite result; they should receive more lenient sentences than Soto, Daskos, and Javat.  This result is more just than a system in which sentences are based on arbitrary factors such as sentencing guidelines that unduly emphasize the loss amounts as a proxy of culpability without considering the defendant's actual role. *See U.S. v. Krutsinger*, 449 F.3rd 827 (8th Cir. 2006) (holding district court had not improperly applied § 3553(a)(6) or abused its discretion when it compared sentences between similarly situated defendants who had committed same crime); *United States v. Lazenby*, 439 F.3d 928, 934 (8th Cir. 2006) (concluding that district court should have given more weight to extreme disparity between co-defendants' sentences since such disparity fails to serve legislative intent of § 3553(a)(6)).

5.    <u>The need to provide restitution to any victims of the offense</u>

Pursuant to 18 U.S.C. § 3663A, restitution is mandatory in this case. If the Court sentences Mr. Chopra to an extended prison sentence, it would likely result in ITL going out of business which would have a significant negative impact on his ability to pay restitution. When determining an appropriate sentence, this Court should consider "the need to provide restitution to any victims of the offense." See 18 U.S.C. § 3553(a)(7); see also, e.g., *United States v. Menyweather*, 447 F.3d 625, 634 (9th Cir. 2006) (acknowledging district court's discretion to depart from guidelines to impose probationary sentence, because the "goal of obtaining restitution for the victims of Defendant's offense . . . is better served by a non-incarcerated and employed defendant"); see also *United States v. Peterson,* 363 F. Supp. 2d 1060, 1061–62 (E.D. Wis. 2005) (granting a variance so that defendant could work and pay restitution).

Mr. Chopra sincerely desires to make amends and provide additional significant restitution payments to all victims.  This Court should minimize her period of incarceration and maximize his ability to make the restitution the victims deserve.

**B.     <u>Application of These Factors to Mr. Chopra's Case Calls for a Below Guidelines Sentence</u>**

The Supreme Court has repeatedly emphasized that the Court's assessment of the appropriate sentence is to be individual, stating:

> "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon* v. *United States* , 518 U. S. 81, 113 (1996) . Underlying this tradition is the principle that "the punishment should fit the offender and not merely the crime." *Williams* , 337 U. S., at 247; see

> also *Pennsylvania ex rel. Sullivan* v. *Ashe* , 302 U. S. 51, 55 (1937) ("For the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender").

*Pepper v. United States*, 131 S. Ct. 129, 1239-1240 (2011). Consideration of Mr. Chopra's history and character, his offense and other applicable factors support multiple grounds for variances resulting in a below-guidelines sentence.

Permitted Variances

Many factors in Mr. Chopra's case that might not have qualified for a downward departure may now be considered by the Court in determining whether a variance is appropriate. "Variances do differ from departures. There may well be cases that would not justify a departure under the Guidelines but which are appropriate for a variance." *United States v. Chase*, 560 F.3d 828, 830 (8th Cir. 2009)(internal citation omitted).

***The Fraud Guidelines Unduly Emphasize Loss
Amount Without Considering Mr. Chopra's Limited Role***

In this case, a Guidelines sentence based on the loss amount would be significantly greater than necessary to achieve these purposes. While the defense does not dispute the seriousness of the overall fraud, a Guidelines calculation based on the total losses suffered by the victim companies in transactions where ITL shipped goods would significantly overstate the seriousness of his role in that offense and violate the principle of "incremental immorality" that underlies the notion of just punishment under § 3553(a). *United States v. Martinez-Rios*, 143 F.3d 562, 670-71 (2d Cir. 1998). Although Mr. Chopra's company is culpable for assisting Uniworld in actively misleading manufacturers about their products

ultimate destinations, it bears emphasizing that, unlike others involved in the conspiracy, Mr. Chopra and Mr. Armando were not privy to any negotiations or communications between the victim companies and Uniworld, did not hold any proprietary interest in any of the shipments, and had no knowledge, whatsoever, as to under what terms the products were sold. Nor were they involved in the removal of labels/stickers indicating that the victim companies' products were to be exported. Their financial gain, as the government concedes, was limited to ordinary and customary fees for their company's services, which resulted in a *loss* of $13,134.71 for the time period of the conspiracy. Thus, although there exists a causal link between Mr. Chopra's conduct and the ultimate injury suffered by the victim-manufacturers in this case, application of the Guidelines significantly magnifies the sentence based on a loss amount that grossly overstates his actual role in the offense. The case of *United States v. Hill*, 643 F.3d 807, 848 (11th Cir. 2011) is instructive.

In *Hill*, Barbara Brown, an appraiser, was caught up in a mortgage fraud scheme with a total loss of over $4 million. She did not earn any money as a result of her participation in the scheme. Ms. Brown, a first-time offender, faced a sentencing range of 63-78 months. The court, acknowledging "her extraordinary lack of profit" and "how the amount of loss grossly overstated her criminal conduct compared to that of the other defendants," and sentenced her to five months imprisonment. The Eleventh Circuit upheld the downward departure. *Id*. at 848. *See also United States v. Williams*, 529 F. App'x 6, 9 & n.4 (2d Cir. 2013) (affirming district court's below-Guidelines sentence where, "inasmuch as the intended loss amount generated a 30-level increase in [the defendant's] offense level, . . . it 'substantially overstated' the seriousness of the offense"); *United States v. Levenson*, 314 F. App'x 347, 349-50 (2d Cir. 2008) (affirming below-Guidelines sentence where "loss amount of $40 million overstated the

seriousness of Levenson's role in the offense" (internal quotation marks and alteration omitted); *United States v. Mohan*, 62 F. App'x 372, 373 (2d Cir. 2003) (affirming downward departure in a bank fraud cause "on the ground that the intended loss amount . . . overstated [the defendant's] culpability") and *United States v. Stuart*, 22 F.3d 76, 83 (3d Cir. 1994) ("Where the application of the Guidelines' monetary tables bears little or no relationship to the defendant's role in the offense and greatly magnifies the sentence, the district court should have the discretion to depart downward."). A Guidelines sentence is inappropriate here, as it substantially overstates Mr. Chopra's culpability and fails to provide for just punishment.

### *Loss of Employment/Business*

The seriousness of the offense has been partially mitigated by the punishment Mr. Chopra has already, and in the future, will receive given the social stigma of his convicted felon status. He knew that accepting responsibility for his actions would result in irreparable damage to his reputation and the economic opportunities he and his family would have in the future. He knew that admitting guilt and accepting responsibility could quite possibly put the company he has built up for over a decade out of business. ITL has suffered significant setbacks and decreased revenues over the past year and a half. *Composite Exhibit D, pages 165-166.* Mr. Chopra has had to layoff employees in his efforts to keep the business afloat during the pendency of this case. This Court can, and should, consider Mr. Chopra's loss of reputation and business as a factor when viewing what a just punishment is. *See United States v. Stewart,* 590 F. 3d 93, 141 (2d Cir. 2009)(Court approved as reasonable a variance from guidelines of 78-97 months to 20 months, because the defendant's conviction for violating

rules against communicating with a prisoner "made it 'doubtful that [he] could pursue' his career as an academic or translator."). *See also United States v. Anderson,* 533 F.3d 623, 633 (8th Cir. 2008)(Court affirmed a 7-month variance for a defendant convicted of insider trading and money laundering, based in part on how the defendant "suffered atypical punishment such as the loss of his reputation and his company.")

There is no question that the consequences of Mr. Choprar's conduct will carry on with him beyond any sentence imposed by the Court. He has already effectively begun the rehabilitative process and effectively accepted the consequences of his actions. No sentence imposed by this Court will take away his abiding shame that he has caused to his wife, children, and relatives, and the forever stigma of being a convicted felon. Mr. Chopra is painfully aware of how his actions have impacted his family and will continue to significantly impact his ability to provide financially for his family.

### *Post Offense Rehabilitation & Low Risk of Recidivism*

In *Pepper v. United States*, the Supreme Court emphasized that evidence of post-sentencing rehabilitation may be highly relevant to several of the § 3553(a) factors. Such evidence, the Court said: may also be pertinent to "the need for the sentence imposed" to serve the general purposes of sentencing set forth in § 3553(a)(2) – in particular, to "afford adequate deterrence to criminal conduct," "protect the public from further crimes of the defendant," and "provide the defendant with needed educational or vocational training ... or other correctional treatment in the most effective manner." §§ 3553(a)(2)(B)-(D); *See United States v. McMannus*, 496 F.3d, at 846, 853 (8th Cir. 2007) (Melloy, J., concurring) ("In assessing

...deterrence, protection of the public, and rehabilitation, 18 U.S.C. § 3553(a)(2)(B)(C) & (D), there would seem to be no better evidence than a defendant's post-incarceration conduct"). *Pepper*, 131 S. Ct. at 1242. Additionally, the Court found that "post-sentencing rehabilitation may also critically inform a sentencing judge's overarching duty under § 3553(a) to 'impose a sentence sufficient, but not greater than necessary' to comply with the sentencing purposes set forth in § 3553(a)(2)." Id.

> Equally significant for Mr. Chopra's case, the Court indicated that:
>
> Post sentencing conduct also sheds light on the likelihood that he will engage in future criminal conduct, a central factor that district courts must assess when imposing sentence. See §§ 3553(a)(2)(B)-(C); *Gall*, 552 U.S., at 59, 128 S.Ct. 586 ("Gall's self-motivated rehabilitation ... lends strong support to the conclusion that imprisonment was not necessary to deter Gall from engaging in future criminal conduct or to protect the public from his future criminal acts" (citing §§ 3553(a)(2)(B)-(C)). Finally, Pepper's exemplary post-sentencing conduct may be taken as the most accurate indicator of "his present purposes and tendencies and significantly to suggest the period of restraint and the kind of discipline that ought to be imposed upon him." *Ashe*, 302 U.S., at 55, 58 S.Ct. 59. Accordingly, evidence of Pepper's post-sentencing rehabilitation bears directly on the District Court's overarching duty to "impose a sentence sufficient, but not greater than necessary" to serve the purposes of sentencing. § 3553(a).

*Id.* at 1242-43.

For precisely the same reasons, Mr. Chopra's self-motivated, post-arrest rehabilitation "lends strong support to the conclusion that extended imprisonment is not necessary to deter him from engaging in future criminal conduct, or to protect the public from his future criminal acts." It may also be taken as "the most accurate indicator of his present purposes and tendencies and significantly to suggest the period of restraint and the kind of discipline that ought to be imposed upon him." Mr. Chopra has clearly demonstrated that he is truly repentant

and has achieved real gains in rehabilitating himself and changing his behavior. He has also shown that this offense represents a marked deviation from an otherwise law-abiding life.

Mr. Chopra's age and background make the risk of recidivism slight. The United States Sentencing Commission itself has noted that there is a low risk of recidivism for offenders in the following categories: first offenders, those over 50, those who have had stable employment in the recent past, those who have had higher education, married offenders, non-violent offenders, and offenders who do not use drugs. *See* https://www.ussc.gov/research/research-publications/measuring-recidivism-criminal-history-computation-federal-sentencing-guidelines[2]. Mr. Chopra fits into every single one of those categories.

A growing number of courts have taken both age and first-offender status into account when fashioning an appropriate sentence under 18 U.S.C. § 3553(a). See, e.g. *United States v. Darway*, 255 Fed.Appx. 68, 73 (6 Cir. 2007); *United States v. Hamilton*, 323 Fed. Appx. 27, 31 (2d Cir. 2009)(the district court abused its discretion by not taking into account policy considerations with regard to age recidivism not included in the Guidelines); *United States v. Cabrera*, 567 F. Supp 2d 271, 279 (D. Mass. 2008) (granting variance because defendants "with zero criminal history points are less likely to recidivate than all other offenders); *United States v. Urbina*, slip op., 2009 WL 565485, *3 (E.D. Wis. 2009)(considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history and strong

---

[2] The Commission's 2016 study found similar trends. See U.S. Sent'g Comm'n, Recidivism Among Federal Offenders: A Comprehensive Overview (March 2016) https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf

family ties) The court should not be concerned with having to protect the community from future harm by Mr. Chopra based upon the above factors.

### *Charitable Works*

A Defendant's record of charitable works has been recognized as a § 3553(a) factor supporting a downward variance even when the works are not particularly exceptional. *See United States v. Thurston*, 544 F.3d 22, 26 (1st Cir. 2008) (on remand from the Supreme Court in light of *Gall*, affirming a downward variance based good works where, before *Gall*, the court had vacated the sentence because the good works were not sufficiently "exceptional"); *see also United States v. Panyard*, No. 07-20037, 2009 WL 1099257 (E.D. Mich. Apr. 23, 2009) (finding that the "[d]efendant's acts of kindness, generosity and good deeds appear to span years" support a variance). In *United States v. Tomko*, 562 F.3d 558, 571 (3d Cir. 2009), the Third Circuit, sitting en banc, affirmed a below-guideline sentence of probation, community service, restitution, and fine on a conviction for tax evasion, which was based in part on the defendant's "extensive charitable works."

As noted previously,  Mr. Chopra has generously donated his time and energy to various charitable organizations before the pendency of this case. This is properly considered under the § 3553(a) factors and supports a downward variance by this Court.

### *Family Circumstances*

As recounted above, Mr. Chopra plays a critical role in the lives of his children, wife, and extended family.  Whether they live in California, Australia, or India, he does his best to financially and emotionally support them.  These family circumstances are a part of his history

and characteristics pursuant to §3553(a)(l), and can properly be considered as but one factor rendering a below-guideline sentence reasonable under *Booker*.[3] The Courts have repeatedly affirmed below-guideline sentences based in part on family ties and responsibilities. *See U.S. v. Martin*, 520 F.3.d 87 (1st Cir. 2008)(affirming a substantially reduced sentence from a 262-327 month career offender guideline range based in part on family circumstances); *U.S. v. Sayad*, 589 F.3d 1110 (10th Cir. 2009)(affirming 90 day sentence below 57 – 71 month guideline range; court did not err basing sentence in part on fact that defendant was needed to run the family restaurant and take care of his ailing father, and imprisoning the defendant could have "disastrous" consequences to his family).

The hardship that Mr. Chopra's incarceration would inflict on his wife, elderly mother, three children, and extended family would be grave. His mother and other relatives in India rely on him financially as well as his children. His ex-wife and mother to his two minor children in Australia would be forced to single-handedly bear the financial burden of supporting their children and his children would be completely cut off from their father on the other side of the world.  In sum, the combined circumstances of Mr. Chopra's family ties and responsibilities merit consideration as a factor in the Court's granting of a variance below the guideline range.

### *Aberrational Nature of his Acts*

As his letters of support make clear, participation in this scheme was aberrational when compared to the rest of Mr. Chopra's life. He did not set out to commit this crime in the sense

---

[3] It should be noted that after *Booker*, a defendant need not meet the specific legal requirements for a departure pursuant to § 5H1.6 to receive a below-guideline sentence pursuant to § 3553(a). Now that the Guidelines are advisory, this Court may sentence a defendant below the guideline range as long as such a reduction is not "unreasonable" in light of all of the § 3553(a) considerations. See *Booker*, 125 S.Ct. at 766.

that he partook in plotting how to hoodwink the victim manufacturers into selling their products at unjustified discounts. His crime was participating in the execution of this scheme as a service provider instead of refusing to provide transportation services in the illegal manner dictated by his client.  Unfortunately, he allowed his fixation on growing his company and the pressures of running it affect his better judgment. Although his motive was to earn money, it was through providing his company's services.   In short, he helped Uniworld deceive manufacturers about the ultimate destination of their products so he could keep them as a client.  When one looks at the totality of Mr. Chopra's life, the circumstances of the offense and the role he played in it, his conduct in this case is clearly an aberration that lifts this case out of the heartland for purposes of sentencing. These factors make a loss driven calculus, which contains no measure of morality, meaningless in terms of measuring his culpability.

And this is a factor that this Court can take into account, as other courts have. *See, e.g., United States v. Howe*, 543 F.3d 128 (3rd Cir. 2008)(affirming probationary sentence and temporary home confinement for wire fraud despite an 18-24 months guideline range, where the appellate court construed district court to have termed the offense an "isolated mistake" in the context of Howe's otherwise long and entirely upstanding life); *United States v. Hadash*, 408 F.3d 1080, 1084 (8th Cir. 2005) (six-level downward departure upheld where district court concluded that defendant was "law abiding citizen who [did] an incredibly dumb thing" and "was not the type of defendant the guidelines section was designed to punish").

**C.      The Need for the Sentence Imposed to Promote Statutory Objectives**

A sentence substantially below the advisory guidelines will still promote the statutory

purposes of sentencing laid out in 18 U.S.C. § 3553(a)(2), as follows:

1.      To reflect the seriousness of the offense, promote respect for the law, and to
        provide just punishment for the offense

Mr. Chopra knows that this was a serious offense and has resigned himself to the

possibility of a term of incarceration. But, in assessing the "just punishment," we ask the Court

to take into account the facts and factors noted in this memorandum, especially that Mr.

Chopra's primary motivation was to provide a service to a client at a reasonable rate and retain

that client's business, not defraud the manufacturers. Moreover, facing the prospect of losing

his company, losing his good reputation, watching his wife suffer, and having to live with the

deep shame that he has not lived up to the good example he strived to set for his children, are

themselves significant punishment.

2.      To afford adequate deterrence to criminal conduct

There is no need in this case for a  lengthy term of imprisonment to serve as a deterrent

to criminal conduct for Mr. Chopra or others. The collateral consequences Mr. Chopra has

faced and will continue to face, unquestionably add to both the punitiveness and deterrent

effect of his felony conviction. *See United States v. Jagemann*, 2007 WL 2325926 (E.D. Wis.

Aug. 8, 2007) (finding that prison not necessary to satisfy purposes of punishment for

defendant convicted of possession with intent to distribute cocaine, in part, because "defendant

faced significant collateral consequences based on his conviction, including the possible

suspension of his license by state authorities and his prescription-writing privileges by the DEA. This added to both the punitiveness and the deterrent effect of the felony conviction, in a manner not faced by a defendant who did not hold such licenses") (citing 18 U.S.C. §§ 3553(a)(2)(A) & (B)); *United States v. Redemann*, 295 F.Supp.2d 887 (E.D .Wis. 2003) (departing downward, in part, because "a great deal of adverse publicity in his small town . . . injured his business, which was dependant on defendant's reputation and goodwill" which "partially satisfied the need for just punishment, . . . will likely deter him from future misconduct, which mitigates the need to protect the public from further crimes," and served general deterrence because "someone else in defendant's position tempted to also become involved in such a scheme need only consider what happened to defendant in order to reconsider").

3.   <u>To protect the public from further crimes of the defendant</u>

As noted above, Mr. Chopra's age, lack of record, stable family and employment history, and most significantly, his demonstrated post-arrest rehabilitation, show that there is a low risk that he will recidivate.  The collateral consequences Mr. Chopra has already suffered, and will continue to suffer, as a result of his criminal conduct, have adequately conveyed the seriousness of Mr. Chopra's conduct. He is deeply remorseful, has suffered extreme shame, and will have to live with the collateral consequences of his conduct for the rest of his life.

4.   <u>To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner</u>

There is no need for any such treatment or training in this case.

**SURRENDER AND DESIGNATION**

If sentenced to a term of imprisonment, Mr. Chopra requests a judicial recommendation that he be designated to the lowest security institution for which he qualifies which is nearest to his family. He requests that he be permitted to surrender there voluntarily and will do so immediately after receiving his designation.

**CONCLUSION**

This Court has the power and discretion to fashion a sentence that better serves this community and this defendant. A term of incarceration, as suggested by the guideline range, would cause devastation to Mr. Chopra's family, fail to have a deterrent effect, result in an unwarranted disparity between similarly situated defendants, and fail to take into account the unique circumstances of this case. Mr. Chopra made a terrible mistake for which he accepted responsibility. His profound shame and self-examination since his arrest, motivated him—and continues to motivate him— to share his cautionary tale with young people about to embark on their own business careers. A sentence in the advisory guideline range wholly fails to recognize the unique circumstances of this case and would result in an unjust sentence greater than necessary to achieve the statutory purposes of punishment as required by 18 U.S.C. § 3553(a). We, therefore, ask the Court to consider a probationary sentence, which would recognize the uniques circumstances of his case and fairly reflects his and Mr. Armando's culpability in relation to the other defendants.  Should the Court decide that a term of imprisonment is a necessary component of his sentence, we would suggest that a sentence of a year and a day is sufficient, but not greater than necessary, to comply with the directives of 18 U.S.C. § 3553(a).

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished to all counsel of record via transmission of notices of electronic filing generated by CM/ECF, on this 12th day of December, 2019.

Respectfully submitted,

The Edelstein Firm
4770 Biscayne Blvd., Ste. 1250
Miami, Florida 33137
Tel: 305.538.4545
Fax: 305.535.7655

By:    s/David M. Edelstein
        David M. Edelstein
        Florida Bar No: 063665
        Attorney for Defendant
        david@theedelsteinfirm.com